Filed 1/22/14  Christy C. v. Super. Ct. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CHRISTY C. et al.,<br><br>        Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF MARIN COUNTY,<br><br>        Respondent;<br><br>MARIN COUNTY HEALTH & HUMAN SERVICES DEPARTMENT et al.,<br><br>        Real Parties in Interest. | A140037<br><br>(Marin County Super. Ct.<br> Nos. JV25777A & JV25778A) |

In this consolidated writ proceeding, C.C. (mother) and T.S. (father) seek extraordinary relief from the juvenile court order bypassing reunification services for both parents and setting a permanency planning hearing for the couple's twin children, T.S. and T.S., Jr. (now age 18 months).  Specifically, the parents argue that the juvenile court erred by denying them reunification services pursuant to subdivision (b)(13) of section 361.5 of the Welfare and Institutions Code[1] based on their extensive histories of substance abuse.  We deny the consolidated petition.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

# I.  BACKGROUND

Petitions in these juvenile dependency proceedings were filed by the Marin County Department of Health and Human Services (the "Department") on May 6, 2013, after the police discovered the 10-month old minors, T.S. and T.S., Jr., in a hotel room with their parents and two unrelated adults.[2]  Both parents were believed to be under the influence of a controlled central nervous system stimulant, although father claimed not to have used methamphetamine for the last four days and mother only admitted to taking four "Norco" pills (a narcotic pain reliever).  As a result of this police intervention, both parents were arrested on charges of being under the influence of a controlled substance, possession of paraphernalia used for unlawful injecting or smoking, and child endangerment.  In addition, father was charged with violation of probation.  Unfortunately, this arrest was not the beginning of the story with respect to these parents' issues with substance abuse, child welfare intervention and the criminal justice system.  Rather, it was merely the latest chapter in a long and tragic history marked by chronic drug and alcohol dependency, multiple arrests, and the repeated failure to provide a safe and stable environment for their many children, all despite the almost constant availability and provision of services.

By mother's own report, she began experimenting with drugs and alcohol when she was 12 years old.  She spent her middle school years with an aunt in South Carolina—who the family thought might better be able to control her—before returning to California for high school.  Mother dropped out of high school, however, when she became pregnant with her first child, Marcos A., who was born in April 1998.  Despite the fact that Marcos's father, Juan A., was "mentally abusive" to her and spent time with other women, mother lived with him for several years.  In February 2000, when Marcos was not yet two, she left the toddler with a babysitter and disappeared.  Mother called nine days later, admitted to having been on a cocaine binge, and completed a three-day

---

[2] Mother and father are not married, but father was granted presumed father status at the May 9, 2013, detention hearing in these matters.

detox program.  During this timeframe, she signed legal custody of Marcos over to Juan, indicating that she needed to get into treatment.

In February 2001, mother gave birth to her second child with Juan, Tito A.  She then moved back to South Carolina where she became involved with a different man and gave birth to her third child, Justice M. in 2002.  According to mother, when she tried to leave South Carolina, Justice's father would not allow her to take the boy.  She therefore left Justice in his father's care.  In the end, mother's aunt agreed to take guardianship over the minor.

Upon her return to California, mother renewed her relationship with Juan A., giving birth to her fourth child, Christopher, in February 2004.  While she was pregnant with Christopher, mother entered the Center Point residential treatment program.  She reported completing six months of inpatient treatment and two months of outpatient treatment before she was asked to leave the program for driving without a license.  Mother claims that she stayed with Juan A. during this period because he threatened to kill her, pulled guns on her, and told her that—if she tried to leave—he would take the children to Mexico.  Eventually, Juan A. was deported to Mexico, where he is reportedly incarcerated on murder charges.

Leaving Marcos, Tito, and Christopher in the care of their maternal grandmother, mother then traveled back to South Carolina, hoping to reunite with Justice and his father and find housing so that her whole family could live together.  Unfortunately, things did not go as planned.  Instead, mother relapsed and was arrested in South Carolina on September 15, 2005, for drug possession.  On March 2, 2006, charges were again filed against mother in South Carolina, this time for loitering to engage in drug activity.  In addition, mother met Ronald Y. and became pregnant with her fifth child, Jasmine.  Regrettably, mother used drugs and did not receive prenatal care while pregnant and, as a result, Jasmine Y. was born medically fragile in July 2006, with mother testing positive for cocaine and marijuana and the baby testing positive for cocaine.  Of great concern was the fact that, when Jasmine was born, mother reportedly waited over two hours before contacting emergency services.  Jasmine was placed in foster care and mother

3

received a six-month jail sentence for criminal child neglect.  Ultimately, after mother entered, but failed to complete, a treatment program, her parental rights were terminated and Jasmine was adopted.

Mother was again arrested in South Carolina for drug possession in January 2007.  James T. helped mother financially and assisted her with her criminal charges.  Soon, she became pregnant again, this time with Jada T., her sixth child.  Mother was incarcerated for a probation violation when she gave birth to Jada in September 2007.  Thus, Jada lived with mother's aunt for the first three months of her life until mother was released from jail.  Thereafter, mother and Jada spent one or two nights a week with James T. at the motel where he was staying.  Mother stated that they did not spend more time with James because he was dealing drugs.  Instead, mother became involved with David Y. and conceived her seventh child, N. C.  Initially, mother knew little about David, but later she learned that he had served 20 years on a murder charge.

While she was pregnant with N., mother returned to Marin County and entered a residential treatment program at Marin Services for Women (MSW).  She completed the program in June 2008 and gave birth to N. in December 2008.  Mother reported that she was able to stay clean and sober for approximately 11 months during this time frame, her longest period of sobriety since she was 14 years old.  While sober, she cared for Marcos, Tito, Christopher, Jada, and N.

Then, on April 9, 2009, the Department received a referral indicating that mother was using drugs again and that her ten-year old son, Marcos, had pulled a knife on someone in an attempt to get all of the "strange" people that his mother had invited into the house to leave.  There were concerns that drug addicts and " 'crack heads' " were coming in and out of the home where mother's two baby girls resided and that mother might not be able to protect her children due to her own drug use.  On May 13, 2009, while the Department's investigation was pending, mother was taken by paramedics to the Novato Community Hospital after she was found wandering the streets, agitated and confused.  Mother admitted that she has been on a two-day methamphetamine binge, and she tested positive for methamphetamines, cocaine, and marijuana.

4

On that same date, the police received information that mother's three youngest children had been left without adequate supervision. Apparently, Marcos and Tito were staying with paternal relatives. Mother claimed she had hired a male acquaintance to watch Christopher, Jada, and N., but when Marcos stopped home to get some clothes before school, the man left the children in the boy's care. When the authorities arrived, one-year old Jada was wearing an older brother's dirty shirt and a diaper wet with urine. Upon changing Jada's diaper, the social worker discovered two nickel-sized sores above her vaginal area. Four-month old N. also had a full diaper and was found face down on a couch with part of her head wedged between the couch's back and the seat cushions. When mother arrived at the Department late the next day, she was under the influence of a controlled substance and had many open sores on both of her upper arms. Mother later told a social worker that she had relapsed about a month previously and that her drugs of choice were crack cocaine, marijuana, alcohol, and methamphetamine.

As a result of mother's relapse, arrangements were made to place Marcos, Tito, and Christopher in guardianship with a paternal aunt. Juvenile dependency petitions were filed with respect to Jada and N., alleging inadequate supervision of the minors due to mother's substance abuse. Thereafter, mother briefly entered residential treatment at Center Point from June 29 to July 4, 2009, but left against the recommendation of her treatment team after having a disagreement with treatment staff. Mother then entered the MSW residential treatment program on July 30, 2009, and— after successfully completing three months of inpatient treatment—Jada and N. were returned to her care. Although mother agreed not to take the girls away from MSW and not to leave the program against the advice of her treatment team, she did both less than a month later on November 11, 2009, after being told that she needed to clean her room. As a consequence, Jada, and N. were re-detained on a supplemental petition filed pursuant to section 387.

Shortly after the supplemental petition was filed, however, mother made arrangements to live with her mother until she was able to secure her own housing and Jada and N. were returned to her care for a second time. Mother then re-entered Center

5

Point in January 2010 for six months of residential treatment. At her intake medical exam, she discovered that she was pregnant with her eighth child, Ta. S. Ta. was born in July 2010 and is a daughter of T.S., the father in these proceedings. Because she now had three children in her care, mother was not eligible for transitional housing through Center Point when she completed her six months of residential treatment. Instead, she was referred to a 28-week Continuing Care Group with weekly meetings. Mother attended briefly, but then reported dissatisfaction with the meetings because they included men as well as women. She was therefore referred by the Department to intensive individual therapy. By early 2011, however, the therapist indicated that she would be " 'permanently terminating' " mother's treatment because she consistently missed her appointments without notice. In addition, although court-ordered through her family maintenance plan to drug test, mother became non-compliant with drug testing starting in October 2010, when she began either missing appointments or providing diluted samples.

During this time period, mother was living with father and her children at the Homeward Bound Emergency Family Shelter. Unfortunately, her volatile relationship with father caused the family to be passed over for several more permanent housing opportunities, and mother eventually had to move back in with the maternal grandmother after using up her allotted time at the temporary shelter without finding a more stable housing solution.

Then, on February 11, 2011, mother arranged to have a teenaged niece of father watch her three children at a hotel. The maternal grandmother was having company and did not want the minors in her home, and mother and father planned to go to a friend's house. After arguing with father while driving, father asked mother to get out of the car. Once father went into the friend's house, mother took the car and drove to San Francisco. Her whereabouts were unknown until February 18 when she called her mother to retrieve her. Father reported that she had abandoned her children, stolen his car, and gone "on a drug run." Mother admitted to the social worker that she could not recall where she had been for at least three of the days that she was missing. As a result of this incident, N.

6

and Jada were detained and placed in foster care. Ta. was placed with her paternal grandmother. Ultimately, parental rights were terminated, and Ta.'s paternal grandmother adopted all three girls.[3]

In March 2011, the police found mother to have drug paraphernalia on her person on two separate occasions. That same month, the paternal grandmother reported that mother appeared for a visit with Ta. while under the influence of drugs. Although mother had the opportunity to enter a number of residential treatment programs during this time period (Center Point in April 2011, East Bay Community Center in May 2011, MSW in October 2011, and La Casa Ujima in December 2011), she did not do so. Instead, mother tested positive for cannabinoid in July 2011 and for amphetamines and marijuana in August and December 2011. Moreover, her attempts at outpatient treatment were hampered by repeated incarcerations on May 26, 2011, June 7, 2011, August 3, 2011, and November 17, 2011.

In addition, throughout this period, mother and father continued to engage in domestic violence. Indeed, from December 2010 through July 2011, law enforcement officers had to intervene in incidents of domestic violence between the parents on at least twelve different occasions. In August 2011, a three-year stay away order was put in place against mother, and she was ordered to complete a year of family violence court. In November 2011, mother was reportedly arrested after appearing at a church service that father was attending with the paternal grandmother and the children and fighting with father.

In February 2012, mother again attempted residential treatment, this time at Walden House. She remained in residential treatment through the birth of the twins in

_____

[3] According to the record, mother's parental rights to N. and Jada were terminated on March 14, 2013, when they were adopted by Ta.'s paternal grandmother. The record, however, additionally states that "less than a year later" in September 2012 Ta. was also adopted by the paternal grandmother after termination of parental rights. Obviously, one of these dates is incorrect. From our review of the record it seems more likely that these adoptions took place in 2012. However, for our purposes, what is important is the fact that parental rights were terminated in all three cases.

July 2012 and reportedly successfully completed the inpatient program in December 2012. According to mother, her treatment team recommended transitional housing, but she chose instead to go to a Sober Living Environment (SLE) on Treasure Island with father.

Then, less than three months after she completed residential treatment, mother failed to appear at a court hearing and there were concerns that she had relapsed. These concerns turned out to be well-founded as on March 25, 2013, mother's probation officer reported that mother had been remanded into custody after appearing under the influence at a court hearing. Mother entered residential treatment at La Casa Ujima the next day, taking the minors with her. However, several days later, on April 1, 2013, mother was asked to leave the program due to her cussing and threatening behavior toward staff. Arrangements were made for mother to transfer with the minors to the Love a Child Homeless Recovery shelter where she could participate in an outpatient program. Mother, unfortunately, was unable to maintain in treatment. On April 4, 2013, she left overnight with the minors without informing anyone of her whereabouts. When she returned to the Love a Child program the next day, she tested positive for methamphetamine and marijuana and then left the program permanently with father and the twins.

A paternal aunt located the family three days later living in a broken down van. According to her report, both parents had relapsed, the twins were not dressed appropriately for the weather, and the parents did not have the clothing, food, or diapers necessary to care for the minors. The aunt indicated that she was going to seek temporary guardianship of the children because she was worried about their safety. Subsequently, on May 6, 2013, as stated above, dependency petitions were filed with respect to T.S. and T.S., Jr. after mother was arrested for being under the influence of a controlled substance.

Though admittedly less extensive by comparison, father's history with the criminal justice system, substance abuse, and the Department cannot be minimized. Prior to the April 2013 arrest that formed the basis of these proceedings, father had numerous

convictions—from the time that he was 18 years old—for crimes including grand theft from a person, assault by force likely to produce great bodily injury, false imprisonment, taking a vehicle without owner consent, felony battery with serious bodily injury, petty theft, and driving without a license. Based on these convictions, he had been charged with parole violations on at least 17 separate occasions and had been in and out of the California Youth Authority, prison, and jail repeatedly for 15 years.

With respect to substance abuse, father stated in April 2011 (during Ta.'s dependency proceeding), that he had previously attended the Center Point residential treatment program for approximately five months. According to father, he entered the program voluntarily after he was released from prison, but failed to complete the full six months because he was kicked out for refusing to report rule breakers. Father also spent two months in residential treatment at Turning Point from September to November 2009 as a condition of probation. He reports being kicked out of this program after being caught in the bathroom having sex with mother. As a result, he was required to serve the remainder of his jail sentence.

Thereafter, in July 2010, father was convicted for possession of a controlled substance. In December 2010, the Department received a referral expressing concern that father was using drugs. Further, as stated above, during the time period from December 2010 through July 2011, law enforcement officers had to intervene in incidents of domestic violence between the parents at least twelve times. During one such altercation in March 2011, mother reportedly yelled at father: " 'I'll give you your pipe if you give me my cell phone.' " A police report described the pipe as a " 'glass smoking pipe with round bowl.' "

In addition, as discussed above, father's fourth daughter, Ta. S. (born in July 2010), was adopted by her paternal grandmother after mother and father failed to reunify with her. Ta.'s dependency action was filed on March 29, 2011, after father violated an agreed-upon safety plan whereby Ta. would be cared for by her paternal grandmother and father would not allow unsupervised contact by mother. In connection with this dependency proceeding, father was ordered to participate in domestic violence

9

counseling, drug testing, substance abuse treatment, and parenting education. However, father never followed through with completing the intake process for drug testing and never provided any samples. Moreover, although he attended five weeks of a year-long domestic violence group in May and June 2011, he thereafter ceased to participate. Further, in August 2011, Ta.'s early intervention specialist reported that father showed up "high" to visit the minor. Father was reportedly swaying, his eyes looked strange, and he was holding Ta. so loosely that the specialist was concerned the minor might fall. In December 2011, a relative reported that father was not safe to watch mother's daughter, N. C., due to his substance abuse issues. That same month, the social worker received a report that father had vandalized the home where mother was staying, throwing rocks through the window. Then, on December 21, 2011, father was incarcerated in the Marin County jail on charges of assault, malicious mischief, vandalism, and fighting in a public place. When the social worker visited father in jail in early 2012, he stated that the assault charge was from a prior incident and that he was incarcerated because he got into a fight "with a friend" at Marin General. Father denied vandalizing the home where mother was staying and indicated that he would like to be released into residential treatment. On February 29, 2012, father was convicted of felony battery.

Father began residential drug and alcohol treatment at Walden House in July 2012. Mother was also admitted to Walden House during that time and gave birth to her twins, T.S. and T.S., Jr. that same month. In March of 2013, father left Walden House and moved with mother and the twins to a SLE on Treasure Island. According to father's probation officer, father's case plan was to do a treatment program and remain sober. Although father told his probation officer that he had completed the program at Walden House, he never provided any proof that he had done so.

In a conversation with a social worker on March 26, 2013, father admitted that, prior to getting sober, he used methamphetamines, alcohol, and weed. He claimed that he had been clean at that point for over a year, from the time he was jailed in December 2011. However, the Department received a report in March 2013 that the parents had recently appeared at the office of a former therapist stating that they were in crisis. The

10

couple were yelling at each other in front of the twins and could not be redirected. Mother accused father of using alcohol and methamphetamine on the weekends. Father accused mother of binging on drugs and leaving the children with an unknown party while she prostituted herself. In addition, father's probation officer reported that he tested positive for methamphetamines on March 15, 2013. By April 2013, father had left the SLE. Then, as set forth above, father was arrested with mother on April 27, 2013, for being under the influence of a controlled substance, the twins were taken into protective custody, and these dependency proceedings followed.

As a final matter, we note that father has a total of six children, none of whom remain in his care. His first two daughters—Tay. S. (born in 2001) and Tav. S. (born in 2002)—reside with their respective mothers. A. A. is father's third daughter (born in 2005) and lives with her maternal grandparents under a probate guardianship. As previously discussed, father's fourth daughter, Ta. (born in 2010), was adopted by her paternal grandmother after mother and father failed to reunify. The twins that are the subject of these proceedings (born in 2012) are father's fifth and sixth children and currently reside in foster care.

The twins were formally detained by the juvenile court at detention hearings on May 8 and 9, 2013. Thereafter, a first amended petition was filed with respect to both minors on June 12, 2013, and—after further revisions were made in open court—both parents submitted to jurisdiction on July 8, 2013. On that same date, the juvenile court, after appropriate inquiry and noticing, also determined that the Indian Child Welfare Act (ICWA) did not apply to the proceedings. On July 12, 2013, a second amended petition was filed memorializing the additional changes to the petition made at the jurisdictional hearing.

In its dispositional report filed with the court on August 6 and 12, 2013, the Department recommended that no reunification services be offered to either parent based on their chronic substance abuse issues and resistance to treatment. At the contested dispositional hearing on September 25, 2013, the social worker elaborated as follows with respect to mother: "[I]t's a history of attempting and failing to stay sober, regardless

11

of how long she stays in the program or whether she's been successful with completing the program. The result is a return to the drug use." The social worker attributed this repeated relapse to the fact that mother "has not been able to take the skills that she gains in treatment and apply them to her life outside of treatment," and opined that there are "no supportive services that the Department could offer which would assist her in leading a life that would be safe for her children." With respect to father, the social worker reported that his focus always seemed to be his relationship with mother rather than his sobriety. She also noted his resistance to accepting available services and his continued substance abuse issues, all of which operated to the detriment of his children. Neither parent put on any evidence that reunification efforts would be in the best interests of the children. (§ 361.5, subd. (c) [the juvenile court shall not order reunification services for a parent described by subdivision (b)(13) "unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child"].)

At the conclusion of the dispositional hearing on October 7, 2013, the juvenile court found that both parents met the criteria for bypass of reunification pursuant to subdivision (b)(13) of section 361.5 by clear and convincing evidence. With respect to resistance to treatment, the court specifically opined: "The Court finds the pattern of ongoing behavior developed over these past several years, including difficulties of maintaining shelter for themselves as parents or themselves and their children, the presence of verbal and physical domestic violence between the parents and its impact on . . . their lives and the lives of their twins, the termination of each parent's respective parental rights regarding four of the children, the respective parents commencing and/or completing various substance abuse treatment programs, yet remained unable to effectively use the treatment tools outside of a program to achieve long-term sobriety and remain free of drugs and alcohol, the resumption of substance abuse following treatment programs demonstrates resistance to treatment." Based on these findings, the juvenile court adopted the Department's recommendation that no reunification services be provided and scheduled a permanency planning hearing for February 3, 2014. Mother and father both filed timely notices of their intent to file writ petitions, and the petitions

12

themselves were filed on November 13, 2013.  (Cal. Rules of Court, rules 8.450(e), 8.452.[4])

## II.  BYPASS OF REUNIFICATION SERVICES

**A.**    *Statutory Framework and Standard of Review*

As a general rule, when a child is removed from parental custody under the dependency laws, the juvenile court is required to provide reunification services to "the child and the child's mother and statutorily presumed father . . . ."  (§ 361.5, subd. (a).)  The purpose of reunification efforts is to "eliminate the conditions leading to loss of custody and facilitate reunification of parent and child.  This furthers the goal of preservation of family, whenever possible."  (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478 (*Baby Boy H.*).)  However, in certain statutorily enumerated situations, the Legislature has determined that such reunification efforts are likely to be fruitless and, thus, "the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources."  (*Id.*; see also *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 744, superseded by statute on another ground as stated in *Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1457.)

The statutory sections authorizing denial of reunification services are sometimes referred to as "bypass" provisions.  (*Melissa R. v. Superior Court* (2012) 207 Cal.App.4th 816, 821.)  In the present case, the juvenile court denied reunification services to both parents based on one such bypass provision, subdivision (b)(13) of section 361.5.  Pursuant to that subdivision, reunification services need not be provided if the court finds by clear and convincing evidence that "the parent or guardian of the child has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition that brought that child to the court's attention, or has failed or refused to comply with a program of drug or alcohol treatment described in the case plan required by Section 358.1 on at least two prior occasions, even though the programs identified

---

[4] All further rule references are to the California Rules of Court.

were available and accessible." Once the juvenile court makes a finding bypassing reunification, it " 'fast-tracks' " the dependent minor to permanency planning so that a permanent out-of-home placement can be developed. (*In re Rebecca H.* (1991) 227 Cal.App.3d 825, 838.)

We review an order denying reunification services under subdivision (b) of section 361.5 for substantial evidence. (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 96.) Under such circumstances, we do not make credibility determinations or reweigh the evidence. (*A.A. v. Superior Court* (2012) 209 Cal.App.4th 237, 242.) Rather, we "review the entire record in the light most favorable to the trial court's findings to determine if there is substantial evidence in the record to support those findings." (*Ibid.*)

**B.**      ***Substantial Evidence***

Father argues that there is no substantial evidence supporting the juvenile court's finding under either prong of the analysis required by subdivision (b)(13) of section 361.5. Specifically, he asserts that the evidence was insufficient to support the necessary finding that he had a "history of extensive, abusive, and chronic use of drugs or alcohol." In addition, he contends that the evidence does not support either a finding that he has resisted prior court-ordered treatment during a three-year period immediately prior to the filing of the petition, or a finding that he has failed or refused to comply with a program of drug or alcohol treatment described in a section 358.1 case plan on at least two prior occasions. We disagree.

The record reflects that, as early as 2009, father was ordered to attend the Turning Point residential treatment program as a condition of probation. After two months, he was terminated from the program for failing to follow program rules and was therefore forced to serve the remainder of his jail sentence. Indeed, although the record does not contain the actual dates, father also voluntarily attended five months of a six-month residential treatment program at some point prior to participating in Turning Point. He was also asked to leave this program before completion for failure to follow the rules. Thus, it is clear that father has had issues with substance abuse for a significant period of time.

14

Further, despite these early attempts at treatment, father was arrested on a drug offense in July 2010. In addition, the record contains evidence that he continued to use drugs from December 2010 through December 2011. In fact, by his own admission, father used methamphetamines, alcohol, and weed prior to his incarceration in December 2011. This continued drug usage is particularly troubling as, during this same time period, he was involved in an active reunification plan with his daughter Ta. which was designed to address his substance abuse issues. Due to his resistance to this court-ordered treatment, his parental rights to Ta. were ultimately terminated.

Finally, father entered the Walden House residential treatment program in July 2012 as a condition of probation. Although father told his probation officer that he had completed the program at Walden House, he never provided any proof that he had done so. Tellingly, he resumed his drug usage immediately after leaving the program in March 2013, testing positive for methamphetamines on March 15 and suffering an arrest on April 27, 2013, for, among other things, being under the influence and unlawful possession of drug paraphernalia.

Although the social worker in this case admitted that she did not know the full extent of father's substance abuse history, we believe that the information of which she was aware constitutes substantial evidence of father's "extensive, abusive, and chronic use of drugs or alcohol." (See § 361.5, subd. (b)(13).) Moreover, we agree with the juvenile court that father's pattern of behavior in the several years prior to the filing of the petitions in these matters—including his resumption of drug use following treatment, the ongoing domestic violence between the parents, his difficulties maintaining shelter, the termination of his parental rights with respect to Ta., and his inability to use treatment tools outside of a program to achieve long-term sobriety—represents more than simple relapse. Rather, it constitutes resistance to court-ordered treatment sufficient to support bypass of reunification pursuant to subdivision (b)(13). (See *In re Brooke C.* (2005) 127 Cal.App.4th 377, 382 ["[r]esistance to prior treatment for chronic use of drugs may be shown where the parent has participated in a substance abuse treatment program but continues to abuse illicit drugs"]; *Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67,

15

73 [failure to maintain "any kind of long-term sobriety" despite completion of rehabilitation programs considered resistance to treatment] (*Randi R.*).)[5] Thus, with respect to father, bypass of reunification was proper.[6]

With respect to mother, the evidence supporting bypass of reunification in these cases is overwhelming. By mother's own admission, her history with drugs and alcohol began when she was 12 years old. In 2000, mother had her first reported stay in detox after a nine-day cocaine binge. In approximately 2004, mother completed six months of residential treatment and two months of outpatient treatment at Center Point before being asked to leave for a rule infraction. However, despite this drug treatment, between 2005 and 2007 mother was arrested three times on drug-related charges and gave birth to Jasmine Y., who tested positive for drugs at birth. Ultimately, after mother entered, but failed to complete, a treatment program, her parental rights were terminated and Jasmine was adopted.

In 2008, mother successfully completed a residential treatment program through MSW. However, by 2009, mother was again using drugs and was taken to the hospital after she was found wandering the streets, agitated and confused. While being treated, mother admitted that she had been on a two-day methamphetamine binge. Later that

---

[5] For purposes of section 361.5 subdivision (b)(13), father was "court-ordered" to substance abuse treatment on at least three separate occasions. First, in 2011, father was ordered by the juvenile court to participate in appropriate substance abuse treatment in connection with Ta.'s dependency proceedings. Second, father was ordered to Walden House in July 2012 as a condition of probation. (See *In re Brian M.* (2000) 82 Cal.App.4th 1398, 1402-1403 [failure to attend drug treatment required as a condition of probation constitutes resistance to treatment]. Third, father was ordered to Turning Point in 2009 as a condition of probation. The fact that this prior treatment did not occur during the three years prior to the filing of the petitions in these matters is not fatal under the statute, as only the *resistance* to treatment (through relapse or otherwise) must occur during the three-year period. (See *Laura B. v. Superior Court* (1998) 68 Cal.App.4th 776, 780.)

[6] Since we conclude that substantial evidence supports bypass in this case based on father's resistance to prior court-ordered treatment, we need not reach his argument that he has not been ordered to comply with a program of drug and alcohol treatment under a section 358.1 case plan on at least two previous occasions.

year, mother attempted but failed to complete two separate residential treatment programs, leaving both against the advice of treatment staff. In early 2010, mother did successfully complete six months of residential treatment. By October of 2010, however, she was non-compliant with court-ordered drug testing. And, in February 2011, she went on a seven day "drug run," an incident which led to the detention of two of her children (N. and Jada), and ultimately to the termination of her parental rights with respect to both girls.

Mother tested positive for drugs three times in 2011, was incarcerated four times, appeared at a visit with Ta. while under the influence, and was cited twice by the police for having drug paraphernalia on her person. Despite having the opportunity to enter at least four different residential treatment programs during this time period, she failed to do so. In addition, she engaged in repeated incidents of domestic violence with father.

Mother then successfully completed a residential treatment program at Walden House, where she resided from February through December 2012. By March 2013, however, she was again using drugs, appearing under the influence at a court hearing and testing positive for methamphetamine and marijuana. Mother attempted two separate drug treatment programs, but was unable to maintain in treatment. Then, in the incident that formed the basis for these dependency proceedings, mother was arrested on April 27, 2013, for being under the influence and for unlawful possession of drug paraphernalia. Mother's social worker opined that mother's substance abuse problem was "intractable" and that there were "no supportive services that the Department could offer which would assist her in leading a life that would be safe for her children."

In sum, a vast amount of evidence supports the juvenile court's conclusion that mother's use of drugs and alcohol has been "extensive, abusive, and chronic." (See § 361.5, subd. (b)(13).) Moreover, as with father, mother's pattern of behavior over the three years prior to the filing of the petitions in these matters—her resumption of drug use following treatment; the ongoing domestic violence between the parents; her difficulties maintaining shelter; the termination of her parental rights with respect to Jada, Naya, and Ta.; and her inability to use treatment tools outside of a program to achieve

17

long-term sobriety—clearly amounts to resistance to prior court-ordered treatment for purposes of subdivision (b)(13).[7] (See *In re Brooke C., supra,* 127 Cal.App.4th at p. 382; *Randi R., supra,* 64 Cal.App.4th at p. 73.) Under such circumstances, bypass of mother's reunification services was warranted.[8]

Finally, we also find meritless mother's argument that her due process rights were somehow violated by the juvenile court's dispositional findings in these cases. The statutory structure permitting the bypass of reunification services under certain specified circumstances is constitutional. (*Baby Boy H., supra,* 63 Cal.App.4th 470, 475-478.) To the extent mother argues that her due process rights were violated because the evidence did not meet the required clear and convincing standard of proof, she is simply restating the insufficiency of the evidence claim that we have previously rejected.

Nor do we find compelling her allegation that the dispositional report relied upon by the juvenile court was so biased and unreliable that its admission evinced a lack of due process. Contrary to mother's assertion, there is no indication in the record that the social worker acted unprofessionally or was somehow biased against her. Rather, the dispositional report prepared by the social worker in these matters provided an exhaustive history of mother's long-term and intractable issues with substance abuse, including

---

[7] Mother was court-ordered to stay free from illegal drugs, drug test, and attend aftercare substance abuse treatment in connection with a family maintenance plan adopted in July 2010 in dependency proceedings for her daughters Jada and Naya. In a family reunification plan ordered with respect to Jada and N. in February 2011, mother was again ordered to participate in drug testing and substance abuse treatment. In addition, mother was ordered to engage in substance abuse treatment in connection with Ta.'s dependency proceeding filed in March 2011.

[8] We note in passing that it appears both mother and father also meet the criteria for bypass pursuant to subdivisions (b)(10) and (b)(11) of section 361.5 due to their reunification services and parental rights being terminated with respect to Ta. Mother's reunification services and parental rights were also terminated with respect to Jada and Naya. Given the record before us and the findings of the juvenile court with respect to the parents' resistance to treatment, it cannot seriously be argued that either parent has made a "reasonable effort to treat the problems" that led to the removal of Jada, Naya, and Ta. (See § 361.5, subds. (b)(10) & (b)(11).)

18

documentation of her periods of treatment and sobriety.[9] The report also chronicled the circumstances leading to her loss of custody of all eight of her previous children, both within and outside of the child welfare system. Although it is true that the report did not describe in detail mother's most current attempt at residential treatment, this was due— not to bias—but to the timing of the report's preparation. The report did mention that mother entered residential treatment on June 25, 2013, and that weekly visitation with the twins took place at the program up to the time the report was issued. Under such circumstances, we believe that the requirements for preparation of the dispositional report were satisfied. (§ 358.1; Rule 5.690(a).) Moreover, the social worker was cross-examined at length, and evidence of mother's current efforts was presented at the dispositional hearing through live testimony and other documentary submissions and was therefore available to the juvenile court for consideration. There was no constitutional error.

## III. DISPOSITION

The consolidated petition is denied on the merits. (§ 366.26, subds. (l)(1)(C), (l)(4)(B).) Because the permanency planning hearing in these matters is set for February 3, 2014, this opinion is final as to this court immediately. (Rules 8.452(i), 8.490(b)(2)(A).)

---

[9] Indeed, although mother argues otherwise, the dispositional report did indicate in several places that she entered and successfully completed residential treatment in 2012, and that the twins were born while she was engaged in this treatment program.

19

_____
REARDON, J.


We concur:


_____
RUVOLO, P. J.


_____
HUMES, J.

20